Mark J. Rosenberg
Debra Bodian Bernstein
Christopher M. Tumulty
**TARTER KRINSKY & DROGIN LLP**
1350 Broadway
New York, New York 10018
Telephone:  212-216-8000
Facsimile:  212-216-8001
mrosenberg@tarterkrinsky.com
dbernstein@tarterkrinsky.com
ctumulty@tarterkrinsky.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE FASHION EXCHANGE LLC,

     Plaintiff,

  v.

HYBRID PROMOTIONS, LLC, *et al.*,

     Defendants.

No. 1:14-cv-01254 (SHS)

**DEFENDANT HYBRID PROMOTIONS LLC'S, JARROD DOGAN'S, GAVIN DOGAN'S AND JEFF CALDWELL'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT DISMISSING THE SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ........................................................................................ 1

II.  STATEMENT OF FACTS .............................................................................................. 2

    A.  Hybrid and Its Business ......................................................................................... 2

    B.  Hybrid and Its Promotional Efforts ....................................................................... 4

        1.  Retailer Co-op Advertising Programs ........................................................... 4

        2.  Hybrid's Website .......................................................................................... 5

        3.  Attendance at Trade Shows .......................................................................... 5

        4.  The Success of Hybrid's Promotional Efforts .............................................. 7

    C.  Plaintiff and Its Business ....................................................................................... 8

III. ARGUMENT .................................................................................................................. 8

    A.  The Summary Judgment Standard ......................................................................... 8

    B.  Plaintiff's Claims are Barred by Laches ............................................................... 9

    C.  Plaintiff Cannot Establish Superior Rights in the Asserted Marks ...................... 15

        1.  The Purported Assignments are Impermissible "In Gross" ......................... 15

            a)  The 1998 Assignment was Invalid ...................................................... 17

            b)  The 2002 Assignment was Invalid ...................................................... 18

            c)  The 2006 Assignment was Invalid ...................................................... 18

        2.  Plaintiff Cannot Demonstrate Superior Common Law Rights ..................... 20

IV.  CONCLUSION ............................................................................................................. 25

## I.   PRELIMINARY STATEMENT

In this action for trademark infringement and unfair competition, Plaintiff bases its claims on defendant Hybrid Promotions, LLC's ("Hybrid") and its retailers' use of Hybrid's HYBRID family of marks, which Hybrid began using in 1998.  Hybrid is a well-known apparel company which designs, produces and distributes apparel to famous national retailers such as Walmart, Target, Macy's, Kohl's and Sears.  Hybrid's goods are primarily sold under its and its licensors' marks.   Hybrid's marks include HYBRID, HYBRID PROMOTIONS, HYBRID TEES, HYBRID APPAREL and HYBRID JEM (individually and collectively, the "HYBRID Marks").

Plaintiff brought this action in February 2014, *sixteen years* after Hybrid started using its HYBRID Marks and long after Hybrid had built a large and successful business based on those marks.  In addition to suing Hybrid, Plaintiff named as defendants Hybrid's Chief Executive Officer (Jarrod Dogan), two of its former officers (Gavin Dogan and Jeff Caldwell) and every one of Hybrid's retailers, including retailers that never sold goods bearing any of the HYBRID Marks.  Even though Hybrid's nationwide use of its HYBRID marks has always been open and notorious, Plaintiff claims that it was unaware of Hybrid's use of its HYBRID marks until 2011, when Hybrid filed a Petition for Cancellation before the Trademark Trial and Appeal Board ("TTAB") to cancel Plaintiff's trademark registration for HYBRID & COMPANY (the "Cancellation Proceeding").  This supposed lack of knowledge, if true, is a result of Plaintiff's and its predecessors' admitted failure to comply with their legal obligation to police their marks.  Regardless of the cause of Plaintiff's inaction, Plaintiff's unreasonable delay combined with the resulting prejudice to Hybrid, results in its claims being barred by laches.

Even if Plaintiff's claims are not barred by laches, Plaintiff, as a matter of law, cannot establish that it possesses superior rights in the HYBRID mark.  While Plaintiff claims rights to

the HYBRID and HYBRID & COMPANY marks (collectively, the "Asserted Marks") as early as 1996 through the use of the Asserted marks by three purported predecessors, Plaintiff has not produced any of the written assignments which supposedly evidence the transfers of the Asserted Marks between Plaintiff's predecessors and then to Plaintiff.  Instead, Plaintiff has provided documents and deposition testimony which show that each alleged transfer resulted in an invalid assignment in gross and a broken chain of title.  As a matter of law, Plaintiff, which was not formed until November 2006, cannot show that its rights in the Asserted Marks are superior to Hybrid's rights in its HYBRID Marks which were first established in 1998.  Without superior trademark rights, Plaintiff cannot prevail in this action.

 For these reasons and as more fully set forth below, summary judgment should be granted (i) barring Plaintiff's claims on the grounds of laches, (ii) deeming that Hybrid's rights in its HYBRID marks are superior to Plaintiff's rights in the Asserted Marks or in the alternative, that Plaintiff, as a matter of law, cannot establish superior trademark rights, and (iii) dismissing Plaintiff's claims against all of the individual and retailer defendants.

## II.   STATEMENT OF FACTS

### A.   Hybrid and Its Business

Defendant Jarrod Dogan, Hybrid's CEO, founded Hybrid in 1998, at which time it began doing business under the name and mark HYBRID PROMOTIONS.  At the time, neither Mr. Dogan nor Hybrid was aware of Plaintiff's alleged predecessors' alleged use of the Asserted Marks.  Mr. Dogan and Hybrid did not become aware of Plaintiff or the asserted HYBRID & COMPANY mark until May 2011, when, in the process of applying to register its HYBRID mark, Hybrid received an office action from the United States Patent and Trademark Office which cited Plaintiff's registration for HYBRID & COMPANY.  Although Hybrid has always

expended significant efforts keeping abreast of the marketplace, it first learned of Plaintiff's HYBRID mark and Plaintiff's purported predecessors' claimed rights in the Asserted Marks, in connection with this litigation. (Dogan Decl. ¶ 4).

Initially, Hybrid was in the business of designing and distributing promotional apparel bearing a customer's logo which would typically be distributed by the customer at corporate events.  An example of this type of apparel is a golf shirt with a company's logo on the chest, which that company distributes to clients at a golf outing.  (*Id.* at ¶ 5).  Beginning in 1998, Hybrid distributed throughout the United States promotional materials prominently displaying the HYBRID PROMOTIONS mark. (*Id.* at ¶ 6, Exs. 1, 2, 3). In February 1999, Hybrid began designing, sourcing, marketing and selling t-shirts to retailers nationwide.  Those t-shirts typically bore humorous and other phrases and/or Hybrid's original designs.  The neck labels of many of those t-shirts prominently displayed Hybrid's HYBRID mark. (*Id.* at ¶ 7). In 1999, Hybrid began distributing t-shirts bearing the HYBRID Marks to Miller's Outpost, Pacific Sunwear ("PacSun"), Kohl's and other retailers.  (*Id.* at ¶ 12, Exs. 5, 6).  At the time, Miller's Outpost had several hundred stores, PacSun had over 1,000 stores and Kohl's had approximately 200 stores (and has since grown to over 1,000 stores).[1]  (*Id.* at ¶ 12). In 2000, Hybrid began distributing t-shirts bearing the HYBRID Marks to the Hot Topic, which had approximately 270 stores in 45 states at the time and grew close to 700 locations by 2008.  (*Id.* at ¶ 13).

In 2003, Hybrid moved from doing business under the mark HYBRID PROMOTIONS to doing business under the mark HYBRID TEES and started placing that mark on the neck labels of the apparel it sold.  That year, Hybrid began distributing apparel bearing the HYBRID TEES mark to additional national retailers including Sears and JC Penney. (*Id.* at ¶¶ 16-18). Also in

---

[1] Miller's Outpost (which changed its name to Anchor Blue) sold goods bearing the HYBRID Marks until it went out of business in approximately 2011.

2003, Hybrid began distributing apparel bearing the HYBRID TEES mark through the retailer Mervyn's which had over 150 stores. (*Id.* at ¶ 19).  By 2004, Hybrid's goods were being sold at over 35 different retail chains, representing thousands of retail outlets throughout the United States, many of which were in New York City (where Plaintiff is based) and its suburbs. (*Id.* at ¶ 20). In 2006, Hybrid began distributing apparel bearing the HYBRID TEES mark through Target and Macy's. (*Id.* at ¶¶ 21, 22). In 2007, Hybrid began distributing apparel bearing the HYBRID TEES mark through Walmart. (*Id.* at ¶ 23). Between 1999 and 2008, a number of other large national retail chains began selling apparel bearing the HYBRID Marks throughout the United States including TJ Maxx, Family Dollar and Kmart.[2]  (*Id.* at ¶ 24).

      B.      Hybrid and Its Promotional Efforts

          1.      Retailer Co-op Advertising Programs

Since 1999, Hybrid has expended ▮Redacted▮ dollars advertising and promoting its products. Between 1999 and 2009 alone, Hybrid expended well over ▮Redacted▮ dollars in advertising and promoting its products. (Dogan Decl. ¶ 30). Most of this advertising was in the form of what is known as co-op advertising whereby a retailer of Hybrid's goods, in return for a payment from Hybrid, includes promotions for Hybrid goods in the retailer's advertising.  This advertising is usually in the form of circulars distributed in newspapers and retailer catalogues. At times, the Hybrid apparel shown in these circulars have been identified by the HYBRID Marks or displayed in a manner in which the neck label bearing one of the HYBRID Marks is clearly visible in the photograph of the garment. (*Id.* at ¶ 30). Between 2003 and 2008 alone, Kohl's, Sears, Target and Macy's, among others, began distributing and continue to distribute

_____

[2] Since 2003, Hybrid has also designed, sourced and distributed apparel bearing licensed third party marks.  At all times, many of these licenses have required Hybrid to place the HYBRID Marks and/or the Hybrid Promotions, LLC name on either the neck label or hang tag of the licensed goods. (Dogan Decl. ¶¶ 3, 26-27).

circulars displaying goods bearing one or more of the HYBRID Marks throughout the United States. (*Id.*). In addition, by no later than 2006, retailers such as Sears, JC Penney, Kohl's, Target and Macy's were offering Hybrid's goods on their websites.  At all times, these goods have been identified on the retailer's websites by the HYBRID Marks. (*Id.* at ¶ 31).

       2.   <u>Hybrid's Website</u>

Since 2003, Hybrid has promoted the goods and services offered under its HYBRID Marks on its website - www.hybridtees.com (from 2003 to 2010) and www.hybridapparel.com (since 2010).  (*Id.* at ¶ 33). At all times, Hybrid's website has prominently featured the HYBRID Marks and has made clear that Hybrid was and continues to be in the business of designing, producing and distributing apparel.  (*Id.* at ¶ 34, Ex. 15). Since at least as early as 2006, persons conducting Internet searches for terms such as "hybrid clothing," "hybrid clothes," "hybrid apparel," "hybrid garments," "hybrid shirt" and "hybrid tops" would have landed on a search results page that featured Hybrid as one of the first, if not the first, organic (unpaid) search result. (*Id.* at ¶ 36, Exs. 16-21).

       3.   <u>Attendance at Trade Shows</u>

Since 2004, Hybrid has attended and exhibited its products at the MAGIC trade show, the most prominent and important trade show in the apparel industry. (*Id.* at ¶ 38).  It is typically held twice a year in Las Vegas.  At MAGIC, numerous manufacturers, designers and distributors of apparel and related goods exhibit their goods, typically in booths operated by individual manufacturers, designers and distributors. (*Id.* at ¶ 38). Hybrid has operated a large booth at nearly every MAGIC show since August 2004.   Hybrid's booths at MAGIC have always prominently featured large signage bearing the HYBRID Marks.  Hybrid's booth at the August 2004 show was 600 square feet.   By 2006, Hybrid's booths at MAGIC had grown to

approximately 1,500 square feet and began to be prominently located at the highly visible end of an aisle of booths on the trade show floor.  A booth of this size is significantly larger, i.e., approximately two to three times larger, than many of the booths at MAGIC.  (*Id.* at ¶ 38). By 2009, Hybrid's booths at MAGIC (still located at the highly visible end of the aisle) had grown to approximately 2,400 square feet; and by 2012, Hybrid's 2,400 square foot booth began to be placed next to the entrance of the trade show floor. (*Id.* at ¶¶ 39-40). Between 2005 and 2009 alone, Hybrid spent over Redacted in connection with appearing at various trade shows, the majority of which was related to Hybrid's appearances at MAGIC. (*Id.* at ¶ 41, Ex. 22-27).

At each MAGIC show, the show's organizers distribute a free program which, among other things, identifies every exhibitor in alphabetical order.  Each time Hybrid exhibited at MAGIC, it was listed as an exhibitor in the MAGIC program under the letter "H".  (*Id.* at ¶ 42, Exs. 28-31). Also, since at least 2005, Hybrid has been listed as an exhibitor in the alphabetical listing of exhibitors on MAGIC's website. (*Id.* at ¶ 45; Rosenberg Decl. Ex. 24). The organizers of MAGIC also provide maps showing where each exhibitor's booth is located with each booth having a number corresponding to the exhibitor operating the booth.  These maps include large pull-out maps inserted into the MAGIC programs and strategically placed poster-sized maps accompanied by a large alphabetized exhibitor list with corresponding booth numbers. (Dogan Decl. ¶ 43). Some of these maps, including the pull-out map included in the August 2011 program, identify the larger booths, including Hybrid's, by the name of the exhibitor in bold upper case letters. (*Id.* at ¶ 43, Ex. 32).

Jack Saadia, the principal and at least fifty percent owner of Plaintiff and each of its purported predecessors, testified that he and his brother Gabi Saadia have attended nearly every MAGIC show since at least as early as 1998 and that Plaintiff, its alleged predecessors and

6

Plaintiff's exclusive licensee operated a booth at nearly all of these shows.[3]   (Rosenberg Decl. Ex. 1 at 17:3-13; 21:6-22:11; 27:11-17; 37:3-18; 57:25-58:8; Ex. 2 at 18:17-19:6; 20:13-16). Remarkably, Mr. Saadia claims to have never seen Hybrid's booth at MAGIC, looked at a MAGIC program or used a map distributed at MAGIC. (*Id.* at Ex. 1 at 18:10-20:8).

### 4.    The Success of Hybrid's Promotional Efforts

Since 1999, Hybrid has invested Redacted dollars and Redacted hours promoting and growing its business offered under the HYBRID Marks. (Dogan Decl. ¶ 52).  The primary purpose of these efforts has been to familiarize retailers and licensors with Hybrid and its goods and services offered under the HYBRID Marks and/or to reinforce their knowledge of Hybrid as the source of originally designed apparel offered and sold under these marks. (*Id.* at ¶ 54). These efforts have been so successful that numerous retailers and licensors recognize the HYBRID name and marks as emanating from "Jarrod's company." (*Id.* at ¶¶ 52, 56). To the best of Hybrid's knowledge, between 2003 and 2007, Hybrid became well known within the apparel industry.   Most major apparel retailers, licensors and competitors knew of Hybrid and the HYBRID Marks and associated these marks Hybrid. (*Id.* at ¶ 56).  Thereafter, Hybrid's sales and fame continued to grow.  Put another way, in 2003, Hybrid had total sales of Redacted   In 2014, Hybrid's sales to it ten largest customers alone totaled Redacted (*Id.* at ¶ 60, Ex. 9). Had Plaintiff objected to Hybrid's use of the HYBRID Marks many years ago, Hybrid could have changed its name and mark with little damage to its business.  That is because in the early years of Hybrid's business, a relatively small number or retailers, licensors and consumers were

---

[3] Jack Saadia and his brother Gabi Saadia are and were (a) the primary owners of Plaintiff and its alleged predecessors and (ii) the officers of these entities.  (Rosenberg Decl. at Ex. 1 at 7:25-26:8; 23:12-17; 33:12-18; 48:16-22).

aware of Hybrid and its goods and services.  Now, Hybrid does business with over forty large

national retailing chains and approximately 100 licensors.  (*Id.* at ¶ 60).

### C.   Plaintiff and Its Business

Plaintiff is based in New York City's Garment Center.  (Rosenberg Decl. 1 at 11:5-17).

It claims to be a licensor of trademarks used in connection with apparel, although it never

produced any of its licenses.  Among these marks are the Asserted Marks.  (*Id.* at Ex. 1 at 13:16-

22; 15:3-9).  Since 2008, goods bearing the Asserted Marks have been distributed by Plaintiff's

exclusive licensee, Fame Fashion House, LLC ("Fame Fashion").  (*Id.* at Ex. 2 at 34:24-37-19).

Plaintiff claims it first learned of Hybrid and its use of the HYBRID Marks no later than

November 2011 when Hybrid filed the Cancellation Proceeding.  (*Id.* at Ex. 1 at 104:24-105:15).

Plaintiff, which claims it is being irreparably harmed by Hybrid's use of the HYBRID Marks,

then waited over two years to commence this action.  Not once during that period did Plaintiff

put Hybrid on notice of its alleged infringement or otherwise complain about Hybrid's use of the

HYBRID Marks.

## III.   ARGUMENT

### A.   The Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine dispute as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Rule 56(a)

"mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against any party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party would bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Put another way, the moving party may

meet its burden by showing that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted) ("When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)(internal citation omitted). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

Here, the evidence produced by the parties as well as the evidence not produced by Plaintiff confirms that there are no genuine issues of material fact related to Hybrid's affirmative defense of laches and Plaintiff's failure to show that it possesses superior trademark rights. Summary judgment dismissing Plaintiff's claims is therefore proper.

      B.    <u>Plaintiff's Claims are Barred by Laches</u>

"It is well established that the defense of laches may be asserted in trademark infringement cases, in which case the defense must be resolved before reaching the merits of plaintiff's trademark claims." *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, No. 06–3508–CV, 2007 WL 2914452 at *1 (2d Cir. Oct. 5, 2007) (citations omitted). "Laches will apply where (1) plaintiff had knowledge of defendant's use of its marks, (2) plaintiff inexcusably delayed in taking action with respect to defendant's use, and (3) defendant suffered prejudice as a result." *Id.* (citation omitted). Importantly, a plaintiff's actual knowledge of the

9

defendant's alleged infringement is not required for laches to apply; rather, "a trademark owner is 'chargeable with such knowledge as he might have obtained upon [due] inquiry.'" *Black Diamond*, 2007 WL 2914452 at *3 (quotations omitted); *see also Constellation Brands, Inc. v. Arbor Hill Associates, Inc.*, 535 F. Supp.2d 347, 362 (W.D.N.Y. 2008) (same).  For trademark infringement and unfair competition cases brought in the District Courts within the State of New York, a presumption of laches exists after six years, which is the limitations period for trademark claims brought in New York.  *Conopco Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996).  Once six years has run, the "plaintiff must show why the laches defense ought not be applied in the case." *Black Diamond*, 2007 WL 2914452 at *2.

Closely related to the concept of laches is the trademark owner's duty to police its mark. "'[T]he corporate owners of trademarks have a duty to protect and preserve the corporation's trademark assets though vigilant policing and appropriate acts of enforcement.'" *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 518 (S.D.N.Y. 2008) *quoting* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:91(4th ed. 2007); *see also Black Diamond*, 2007 WL 2914452 at *3 quoting 6, McCarthy § 31:38 (trademark owner has "duty to police its rights against infringers"); *Grupo Gigante Sa De CV v. Dallo & Co. Inc.*, 391 F.3d 1088, 1102 (9th Cir.2004) ("[c]ompanies expecting judicial enforcement of their marks must conduct an effective policing effort").  Where a trademark owner fails to sufficiently police its mark, the excuse of lack of knowledge does not prevent the doctrine of laches from barring the trademark owner's infringement claims. *See e.g. Black Diamond*, 2007 WL 2914452 at * 3; *Brown v. Sixteen, Inc.*, No. 02 Civ. 4630, 2009 WL 1159161 at * 5 (S.D.N.Y. April 28, 2009) (same).  This is particularly true if "the defendant's conduct has been open and no adequate justification for ignorance is offered." *Chandon Champagne Corp. v. San Marino Wine Corp.*,

335 F.2d 531, 535 (2d Cir. 1964); *McDonald's Corp. v. Druck & Gerner, DDS, P.C.*, 814 F.

Supp. 1127, 1136-37 (N.D.N.Y. 1993) (same).

It is undisputed that Plaintiff and its alleged predecessors failed to abide by their duty to

sufficiently police the Asserted Marks. [4]  Plaintiff's Rule 30(b)(6) witnesses admitted that neither

Plaintiff, nor its alleged predecessors, nor Plaintiff's exclusive licensee policed the Asserted

Marks.[5]   (Rosenberg Decl. Ex. 1 at 46:23-47:13; 54:19-23; 60:2-5; 66:5-13; 76:7-77:4; Ex. 2 at

48:17-21;  48:25-49:5).   If Plaintiff and its predecessors were not aware of Hybrid and its

HYBRID Marks, a claim which strains credulity, the fault is their own and is inexcusable.  *Black*

*Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*, No. 1:03-CV-278, 2005 WL

2076279 at *4 (D. Vt. August 26, 2005), *aff'd* No. 06-3508-cv, 2007 WL 2914452 (2d Cir. Oct.

5 2007) (in view of the well-promoted use of the defendant's mark since 1989, the plaintiff "had

to be aware by the mid–1990s that a company using a similar mark was selling goods in direct

competition with it. Therefore, [plaintiff] cannot be excused for the delay in asserting its

trademark rights.").

Had Plaintiff and/or its predecessors conducted even a modicum of policing efforts,  they

would have discovered Hybrid and its widely open use of the HYBRID Marks between 1999

(when PacSun and Kohl's started selling goods bearing the HYBRID Marks) and 2007 (when

---

[4] For the purposes of laches, a predecessor's knowledge or lack of reasonable diligence is attributed to the successor entity.  *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 655 (2d Cir. 1978); *Minder Music Ltd. v. Mellow Smoke Music. Co.*, No. 98 Civ. 4496, 1999 WL 820575 at *2 (S.D.N.Y. Oct. 14, 1999).

[5] While Plaintiff and its predecessors stood by, the HYBRID mark became diluted in connection with apparel.  Currently, third party trademark registrations and use-based applications exist for ORIGINAL HYBRID, HYBRID FLOW, O'NEILL HYBRID, HYBRID-TECH, HYBRID NATION, ECO-HYBRID, HYBRID-SENSOR, while Hybrid Fashions has become a well-known web-based retailer of women's clothing.  (Rosenberg Decl. Exs. 3-10).  These third party registrations and uses confirm that whatever rights Plaintiff may possess, such are rights are very narrow, and strongly suggest that Plaintiff places little value on them.

Walmart started selling those goods).  Among other things, by no later than 2006, (i) Plaintiff, who claims it and its predecessors attended nearly every MAGIC show since at least 2000, could have easily found Hybrid and its use of the HYBRID Marks by simply viewing the outside of Hybrid's large booth, looking under the letter "H" in the exhibitor lists in the MAGIC programs and/or on the MAGIC website or by looking at a MAGIC map; (ii) Plaintiff could have easily found goods bearing the HYBRID Marks on sale at stores such as Sears, Kohl's, JC Penney, Target and Macy's,[6] promoted in these retailers' circulars distributed in New York City and its suburbs and on these retailers' websites; and (iii) could have easily conducted an Internet search which would have shown Hybrid at the top of the search results page.

Simply put, had Plaintiff (or its predecessors) policed any of these "obvious distribution channels … it would have known that the [alleged] likelihood of confusion loomed large." *Black Diamond*, 2007 WL 2914452 at * 3 (quotation omitted).  "Had [Plaintiff] exercised due diligence in policing its mark, it would readily have learned that [Hybrid] was, in fact, selling [apparel allegedly] in direct competition with plaintiff's clothing line as early as [1999]."  *Id.*; *Black Diamond*, 2005 WL 2076279 at *5 (trademark claims barred by laches as there was no justification for trademark owner's ignorance as owner "need only have reviewed a catalog to determine the products [defendant] was promoting. [Defendant's] technical softgoods were widely available at [industry] trade shows, in its catalogs, at retail stores (specialty and chain), and on the internet").

Compounding matters is Plaintiff's more than two year delay in bringing this action after it supposedly first learned of Hybrid's use of the HYBRID Marks in late 2011.  *See Trustees of*

---

[6] These retailers are all located in Manhattan, where Plaintiff and its predecessors have always been based, and/or New York City's other boroughs.  Macy's and JC Penney are located at Herald Square, walking distance from Plaintiff's Garment District headquarters.

*Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 752 (S.D.N.Y. 1997) (laches applied where defendant's use of its mark was "both prominent and national in scope for years" and plaintiff "inexcusably delayed asserting its rights in the mark despite its knowledge of the use of that mark for [three and a half] years."); *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584–85 (2d Cir. 1989) (laches applied where the plaintiff failed to take any steps to enjoin infringing publication for two years after learning of defendant's mark as such delay was "unconscionable"); *Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ.7203, 2006 WL 1012939 at *34  (S.D.N.Y. April 19, 2006) *quoting Stone v. Williams*, 873 F.2d 620, 624 (2d Cir.1989) (Laches found after less than two year delay as "'it is the reasonableness of the delay rather than the number of years that elapse which is the focus of inquiry.'").

It is beyond dispute that Hybrid has been prejudiced by Plaintiff's delay.  Since 1999, it has devoted nearly all of its marketing efforts at the cost of ▮Redacted▮ dollars and ▮Redacted▮ hours building and expanding the HYBRID brand and associating it with Hybrid.  Hybrid's growth has been exponential, growing from total sales of ▮Redacted▮ in 2003 to sales of ▮Redacted▮ to Hybrid's ten largest accounts alone in 2014.  As the Court held in *Brown*, "By waiting at least [six], and as many as [fourteen], years to assert [its] present claims 'Plaintiff precluded the possibility that the Defendant could effectively adopt an alternative marketing position.  Consequently, the Court finds that Defendant was prejudiced by Plaintiff's unreasonable delay'" *Brown*, 2009 WL 1159161 at *7 (quotation omitted); *Manganaro Foods, Inc. v. Manganaro Hero-Boy, Inc.*, No. 01 Civ. 0849, 2002 WL 1560789 at *7 (S.D.N.Y. July 15, 2002) (defendant which "spent considerable resources in advertising and building up its reputation and good will, using its current trade name ... would therefore be severely prejudiced

if it were unable to use [its] name in its current business enterprises."). After all these years, it would be disastrous to Hybrid's business if it is now precluded from using its HYBRID Marks.

Plaintiff's delay has also caused evidentiary prejudice to Hybrid. Due to warehouse and office moves, new accounting software and servers, Hybrid is no longer in possession, custody or control of, among other things, (a) most of its financial and sales information prior to 2009, (b) marketing, promotional and advertising materials, including retailers' circulars prior to 2003; (c) MAGIC programs prior to 2010; (d) neck labels bearing the HYBRID Marks from before December 2003 and (e) archived versions of its website prior to 2010. (Dogan Decl. ¶63). In addition, Mervyn's and Miller's Outpost, two of the original retailers of goods bearing the HYBRID Marks, closed years before Plaintiff brought this action. *See Haggar Int'l Corp. v.United Co. for Food Indus. Corp.*, 906 F. Supp.2d 96, 137 (E.D.N.Y. 2012) (party raising laches defense "affirmatively establishes actual prejudice when it shows that the passage of time has made evidence unavailable or difficult to obtain") (citation omitted).

In summary, Plaintiff knew or should have known of Hybrid's use of the HYBRID Marks by 2007 at the latest but delayed the commencement of this action for more than six years. The presumption of laches therefore applies. *Black Diamond*, 2007 WL 2914452 at * 3. This delay was unreasonable because Plaintiff admits that it and its alleged predecessors failed to police the Asserted Marks and its supposed lack of knowledge is incredible. *See Juicy ZCouture, Inc.*, 2006 WL 1012939 at *34 (laches where trademark owner "failed to present a tenable explanation for why it made no objection, either formal or informal, as [defendant] systematically developed its line of [] products" bearing the accused mark"). And, Hybrid has been prejudiced by Plaintiff's delay in terms of both business and evidentiary prejudice. Summary judgment should therefore be granted dismissing Plaintiff's trademark and unfair

competition claims against all of the Defendants.  *Black Diamond*, 2007 WL 2914452 at *5 (affirming District Court's grant of summary judgment dismissing trademark claims on grounds of laches); *Constellation Bran*ds, 535 F. Supp. 2d at 363 (granting summary judgment on plaintiff's trademark infringement claim based on laches); Brown, 2009 WL 1159161 (same); *Manganaro Foods, Inc.*, 2002 WL 1560789 (same).

In this connection, dismissal of the complaint with respect to Hybrid necessitates the dismissal with respect to all of the retailer defendants based on Hybrid's indemnification of them.  (Dogan Decl. ¶ 65).  *See I/P Engine, Inc. v. AOL Inc.*, 915 F.Supp.2d 736, 748 (E.D. Va. 2012) (*citing Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911 (E.D. Va. 1996), *Van Alen v. Aluminum Co. of America*, 43 F. Supp. 833 (S.D.N.Y. 1942), and *Boyle Leather Goods Co. v. Feldman*, 30 F.. Supp. 914 (S.D.N.Y. 1940))

### C.    Plaintiff Cannot Establish Superior Rights in the Asserted Marks

#### 1.    The Purported Assignments are Impermissible "In Gross"

"The standard test for trademark ownership is priority of use."  *Carpenteri v. Marini*, No. 3:05-CV-00766, 2006 WL 2349586 at * 4 (D. Conn. July, 11, 2006) *citing Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 468 (2d Cir. 2005).  Plaintiff, which was formed in November 2006 [FE 00009-10], claims rights in the Asserted Marks dating back to 1996 based on three purported predecessors' common law use of those Marks.  These alleged prior rights are based on a series of assignments between Plaintiff and its supposed predecessors between 1998 and 2006.  Specifically, Plaintiff alleges that the Asserted Marks were used by Young Girl, Inc. ("Young Girl") as early as 1996 and claims a chain of title based on the following:

(1)    In 1998, Young Girl allegedly transferred its common law rights in the Asserted Marks to YG Designs, Inc. (respectively, the "1998 Assignment" and "YG");

15

(2) In 2002, YG allegedly transferred its common law rights to USA Design, Inc. (respectively, the "2002 Assignment" and "USA Design"); and

(3) In 2006, USA Design allegedly transferred its common law rights to Plaintiff (the "2006 Assignment").

(Dkt. 134 at ¶¶ 44, 46, 48).

While Jack Saadia, a principal of Plaintiff and each of its alleged predecessors, testified that each of these assignments was documented, *Plaintiff has not produced a single document evidencing any of these assignments*. (Rosenberg Decl. Ex. 1 at 35:21-36:4; 46:2-14; 51:13-24). Although "[a]n assignment in writing is not necessary to transfer common law rights in a trademark," McCarthy § 18.4, an act which a party asserts is an implied agreement to transfer trademark rights will be construed as an assignment only if the "conduct manifest[s] agreement" to transfer the rights. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir.1997) (explaining the requirement of "strong evidence" to establish an assignment encourages parties to expressly identify their ownership interest in trademarks and prevents a party "from using self-serving testimony to gain ownership of trademarks"); *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) ("courts must be cautious in scenarios that do not involve clear written documents of assignment" and quoting "strong evidence" standard of *TMT N. Am.*).

Here, the only "evidence" of the alleged assignments is the self-serving testimony of Mr. Saadia. Not only is that evidence not "strong," it is contradicted by his own testimony and the documentary evidence produced by Plaintiff. As set forth below, the testimony and documents show that after Young Girl, YG and USA Design allegedly transferred the Asserted Marks, they each continued significant business operations under those marks *for years*. *Prince of Peace Enterprises, Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp.2d 384, 392 (S.D.N.Y. 2011) (assignor's post-assignment continuation of operations under the mark "suggests a non-transfer of goodwill") (citation omitted). Plaintiff's predecessors' failure to transfer goodwill

16

renders these assignments impermissible assignments "in gross" and prevents Plaintiff from claiming priority based on its predecessors' supposed rights.

Specifically, "an assignment of a trademark and its accompanying goodwill will entitle the assignee to 'step into the shoes' of the assignor, gaining whatever priority the assignor might have had in the mark." *Clark & Freeman Corp., v. Heartland Co. Ltd.*, 811 F. Supp. 137, 139 (S.D.N.Y. 1993) (citations omitted).  However, "where a trademark has been assigned 'in gross,' i.e. without the accompanying goodwill, then the assignment is invalid, and the 'assignee' must instead rely upon his or her own use to establish priority." *Id.*  In other words, "an assignment of a trademark is only valid when it includes all rights in that mark." *Prince of Peace Enterprises*, 760 F. Supp. 2d at 392 (quotation omitted) (emphasis added).  Here, Plaintiff cannot provide "strong evidence" establishing three valid assignments which is required for Plaintiff to rely on its alleged predecessors' use of the Asserted Marks.  Instead, the evidence shows that each of the three "assignments" was a fatally defective assignment in gross.   Plaintiff cannot rely on the rights YG purportedly acquired from Young Girl in 1998, the rights USA Designs purportedly acquired from YG in 2002 or even the rights it purportedly acquired from USA Design in 2006. Instead, Plaintiff must rely on the rights established by its own use of the Asserted Marks, which use commenced some time after Plaintiff was formed in November 2006.

a)   The 1998 Assignment was Invalid

Pursuant to the 1998 Assignment, Young Girl allegedly assigned the Asserted Marks to YG. Young Girl was a retailer and wholesaler of apparel, including apparel bearing the Asserted Marks.  (Rosenberg Decl. Ex. 1 at 24:25-25:25).   Young Girl assigned the Asserted Marks because Mr. Saadia "want[ed] to distinguish retail from wholesale.  So we establish YG Designs at that time and cater to only wholesale and retailer as opposed to individual consumer."  (*Id.* at

17

32:24-33:7).   According to Mr. Saadia, after the assignment, YG was in the business of importing and manufacturing apparel, (*Id.* at 36:20:-25), while Young Girl was in the business of selling at the retail and wholesale levels.  (*Id.* at 34:9-35:6).  However, Mr. Saadia testified that *after* the alleged assignment from Young Girl to YG, Young Girl issued a license to YG with respect to the Asserted Marks.  (*Id.* at 40:6-41:19).  Clearly, if Young Girl, *after* the assignment, granted a license to YG, it could not have assigned all of its rights in the Asserted Marks or all of the goodwill in the Asserted Marks to YG.   *See Prince of Peace Enterprises*, 760 F. Supp. 2d 384, 392.  Moreover, between 1999 and 2002, Young Girl continued to import and manufacture large quantities, *i.e.* ▮Redacted▮ *of units*, of apparel bearing the Asserted Marks, spending over ▮Redacted▮ in the process. (*Id.* at ¶ 12, Ex. 12).

> b) The 2002 Assignment was Invalid

Pursuant to the 2002 Assignment, YG allegedly assigned the Asserted Marks to USA Design.  Prior to the assignment, YG's business was to "[d]esign, produce and import HYBRID product."  (*Id.* at Ex. 1 at 55:5-9).   After the assignment, USA Design's business with respect to those marks was "pretty much the same" as YG's prior business, (*Id.* at 55:10-12), and YG was in the business of "Liquidating inventory. Collect money from retailer, and *that's it*. *It's dormant*."  (*Id.* at 53:10-18; see also 50:12-51:12] (emphasis added).  The documentary record shows that this is not true.  Until at least July 2005, i.e., three years after the alleged assignment, YG continued to design, produce and import ▮Redacted▮ of units of apparel bearing the Asserted Marks, spending over ▮Redacted▮ in the process.  (*Id.* at ¶ 13, Ex. 13).

> c) The 2006 Assignment was Invalid

Pursuant to the 2006 Assignment, USA Design allegedly assigned the Asserted Marks to Plaintiff.  While Mr. Saadia testified that USA Design's business after the assignment in 2006

was "[j]ust liquidating inventory and collection of receivable," (*Id.* at Ex.1 at 62:21-63:4), the documents produced by Plaintiff show that USA Design continued using the Asserted Marks until 2015 – *nine years after the alleged assignment*. (*Id.* at Ex. 14).

\* \* \*

In view of the above, neither Young Girl nor YG nor USA Design transferred all of their respective rights related to Asserted Marks as none of these entities divested itself of its trademark rights and business activities involving the Asserted Marks.  Without an indication that, post-assignment, each of these "predecessors" ceased its operations with respect to producing, importing and marketing goods bearing the Asserted Marks, they "cannot have transferred [] all of [their] goodwill in the Marks."  *Prince of Peace Enterprises*, 760 F. Supp. 2d at 392 (nothing suggests that assignor "transferred all of the goodwill connected to the Marks with the rights to use them" when assignor did not cease its sales of goods bearing the assigned marks after the assignment. An assignee must demonstrate "that the assignor has divested himself of his trademark rights and business activity involving the mark").  As such, each of the assignors' post-assignment continuation of operations under the Asserted Marks "suggests a non-transfer of goodwill." *Id.* (citation omitted); *see also Excell Consumer Products Ltd. v. Smart Candle LLC*, No. 11 C 7220, 2013 WL 4828581 at \*19 (S.D.N.Y. Sept. 10, 2013) (where "evidence, albeit slim" existed that assignor "remained engaged in the business" involving the assigned mark, assignee failed to prove that assignor divested itself of trademark rights and business activities involving the mark.").  In other words, each of the three purported assignments was an invalid assignment in gross.

Thus, the chain of title between Young Girl and Plaintiff is broken in three places.  As a matter of law, Plaintiff cannot establish by "strong evidence" the three assignments necessary for Plaintiff to rely on each its alleged predecessors' prior rights.  Plaintiff must therefore rely on the

rights flowing from its own use of the Asserted Marks, which use commenced some time after its formation in November 2006. *Clark & Freeman Corp.*, 811 F. Supp. at 139 (when there is an assignment in gross, the putative assignee "must instead rely upon his or her own use to establish priority"). There is no genuine dispute that Hybrid, which commenced using the HYBRID Marks in 1998, possesses rights that predate both the November 2006 "assignment" to Plaintiff as well as the 2002 "assignment" from YG to USA Design. Summary judgment should therefore be granted declaring that Hybrid possesses prior rights in the HYBRID Marks. *Id.* In the alternative, summary judgment should be granted holding that as a matter of law, Plaintiff cannot meet its burden of proof in establishing priority of use. *Cyrstal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1321 (11th Cir. 2011) (citations omitted) (plaintiff asserting common law trademark rights bears "the burden of proving its prior use.").

### 2.    Plaintiff Cannot Demonstrate Superior Common Law Rights

Assuming *arguendo* that Plaintiff can establish an unbroken chain of title with respect to the assignments, it still cannot establish superior trademark rights. While Plaintiff possesses a registration for its HYBRID & COMPANY Mark, the registration has a first use date of March 2006, which postdates Hybrid's first use of its HYBRID Marks. To establish prior rights in its HYBRID & COMPANY mark, Plaintiff must rely on its common law rights relating to that mark. However, Plaintiff has not produced any documents evidencing use in commerce of the HYBRID & COMPANY mark prior to 2005. For this reason alone, Plaintiff, which is precluded from relying on documents not previously produced, (Dkt. 110), cannot demonstrate that it possesses superior rights in its HYBRID & COMPANY mark.

As to Plaintiff's unregistered HYBRID mark, Plaintiff must rely exclusively on its common law rights in that mark. "Where a mark is not registered, the plaintiff 'has the burden

of proving that its mark is a valid trademark.'" *Trustees of Columbia Univ.*, 964 F. Supp. at 742

citing *Reese Publishing Co. v. Hampton Int'l Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.

1980). The issue of whether Plaintiff has enforceable trademark rights must be determined

before the issue of confusion can be analyzed. *Rockland Exposition, Inc. v. Alliance of Auto.*

*Serv. Providers of N*J, 894 F. Supp.2d 288, 313 (S.D.N.Y. 2012). If Plaintiff cannot demonstrate

such rights, "its trademark infringement claim fails as a matter of law, and there is no need for

the Court to examine whether [Hybrid's] use of the mark is likely to cause confusion." *Id.* at 324

(collecting cases); *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985) (If the

court rules that the mark is not entitled to protection, "the inquiry properly concludes").

In order to be a valid and protectable trademark, "a mark must be capable of

distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane*

*Capital Mgmt., Inc*., 192 F.3d 337, 344 (2d Cir. 1999) (citation omitted). To establish

protectability of an unregistered mark, "a mark must be sufficiently 'distinctive' to distinguish

the registrant's goods from those of others. A plaintiff can establish a mark as distinctive by

showing that the mark is "inherently distinctive," i.e., intrinsically capable of identifying its

source, or by demonstrating that the mark has acquired "secondary meaning." *Louis Vuitton*

*Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006) (citation omitted).

The HYBRID mark is not inherently distinctive. It is descriptive. Plaintiff admitted as

much in the Cancellation Proceeding, wherein Plaintiff responded to a Notice of Default from

the TTAB by filing an answer and a motion to vacate the default (the "Motion"). In its answer,

Plaintiff asserted that "Petitioner [Hybrid] has no right to the *generic descriptive term Hybrid*."

(Rosenberg Decl. at Ex. 15 at ¶ 20) (emphasis added). In its Motion, Plaintiff contended that a

default judgment should not be entered because

> *the word Hybrid has been in public use long before [Hybrid] applied for Hybrid as a Trademark. Therefore, Respondent [Plaintiff] cannot be considered to have committed anything other than 'nominal fair use' of the word Hybrid which has been in the public domain for years* … Respondent does not offer evidence of its prospective invalidity defense as a responsive pleading; rather, Respondent offers the evidence only for the purpose of showing it has a meritorious defense to the instant litigation.

(*Id.* at Ex. 16 at 5-6) (emphasis added).

The TTAB granted Plaintiff's Motion, holding, among other things, that "respondent's proposed answer establishes that respondent has a meritorious defense."  (*Id.* at Ex. 17 at 3). Accordingly, Plaintiff is judicially estopped from asserting that HYBRID in and of itself is something other than a "generic descriptive term" which is "in the public domain."[7]  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position").

Regardless of whether judicial estoppel applies, it cannot be disputed that Plaintiff, which has the burden of proof, admitted that the term "hybrid" is descriptive.  When used in connection with apparel, "hybrid" describes a garment that is suitable for multiple purposes.  For example, a number of distributors offer hybrid shorts, which are shorts that are designed to be worn as casual short pants but are made of quick drying fabric so that the shorts can double as swimwear. Other hybrid garments include hybrid sports bras which are designed to be worn either under jerseys or alone as a supportive top, hybrid ski jackets (due to a removable fleece lining, the components of the jacket can be worn separately as either a wind breaker or a fleece jacket); hybrid pants (made of denim but designed to look like trousers); and hybrid socks (socks with a

---

[7] Judicial estoppel applies if: "1) a party's later position is 'clearly inconsistent' with its earlier position, 2) the party's former position has been adopted in some way by the court in an earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel" *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).

tread on the sole that can either be worn inside a shoe or alone on yoga mats).  Internet searches for these types of goods confirm the extensive use of "hybrid" to describe a type of apparel. (Rosenberg Decl. at Exs. 18-22).

When a mark is descriptive, use alone is insufficient to confer a protectable interest in the mark.  *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001); *Rockland Exposition*, 895 F. Supp. 2d at n. 27 (plaintiff's contention that it controlled right to descriptive mark based on first use was "unavailing absent proof that its use of [the mark] had acquired secondary meaning before [defendant] used the term").  In order to be a protectable mark, a descriptive mark must acquire secondary meaning.  *Louis Vuitton Malletier*, 454 F.3d at 116.

"Whether a mark has acquired secondary meaning is a factual determination, proof of which entails vigorous evidentiary requirements."  *Rockland Exposit*ions, 894 F. Supp. 2d at 315 (quotation omitted); see also *Greenpoint Fin., Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405, 409 (S.D.N.Y. 2000) (a plaintiff must satisfy a "heavy burden because proof of secondary meaning entails vigorous evidentiary requirements"). The burden of proof rests on the "party asserting rights in the mark," here Plaintiff.  *Rockland Expositions*, 894 F. Supp.2d at 315 (quotation omitted).   "[P]laintiff's burden is to establish that its mark acquired secondary meaning before [Hybrid] began using its allegedly infringing mark."  *Id.* (quotation omitted); see *also Morgans Grp, LLC v. John Doe Co*., No. 10 CV 5225, 2012 WL 1098276, at *5 (S.D.N.Y. Mar. 5, 2012) ("A plaintiff bears the vigorous evidentiary burden of proving by a preponderance of the evidence that his mark had acquired secondary meaning at the time defendant began his allegedly infringing activities").

Plaintiff cannot meet its heavy evidentiary burden of showing that its HYBRID mark acquired secondary meaning before Hybrid started using the HYBRID Marks in 1998.[8]  "Courts within the Second Circuit look at six factors to establish whether a mark has acquired secondary meaning. These include (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Rockland Expositions*, 894 F. Supp. 2d at 315 (quotation omitted).   Plaintiff has not produced (a) any information regarding advertising expenditures, let alone copies of advertisements; (b) consumer studies; (c) copies of unsolicited media coverage or (d) information regarding attempts to plagiarize by Hybrid or anyone else.   Regarding exclusivity of use, Plaintiff's use was not exclusive.   That is because Hybrid Apparel, Inc. (no relation to Hybrid) owned U.S. Trademark Registration No. 2,274,909 for HYBRID for a variety of men's and women's clothing with a date of first use of February 1998.   That registration, which issued in August 1999, was based on an intent-to-use application filed in August 1997. (Rosenberg Decl. at Ex. 23).

At most, Plaintiff's use predated Hybrid's use by just two years.   That is not enough. "[T]the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning." *Rockland Expos*ition, 894 F. Supp. 2d at 322 citing *BigStar Entertainment, Inc. v. Next Big Star, Inc*., 105 F. Supp. 2d 185, 203 (S.D.N.Y 2000) (use of plaintiff's mark was not exclusive, and secondary meaning not found, where plaintiff had used the mark for only two years and third party applications for its mark were pending during that period).   While Plaintiff can point to modest sales of goods bearing the HYBRID mark (i.e., Redacted of units) prior to

---

[8] For each of the assignments of the Asserted Marks found by the Court to be invalid, Plaintiff needs to show that the putative assignee of the invalid assignment established its own secondary meaning in the HYBRID mark.  *Cf. Clark & Freeman Corp.*, 811 F. Supp. at 139.

1998, these sales, without additional evidence of market share or consumer recognition, "do[] little to suggest a recognition among the relevant group on consumers." *Rockland Exposition*, 894 F. Supp. 2d at 321 (collecting cases).

In view of the above, Plaintiff cannot meet its "vigorous evidentiary burden of proving by a preponderance of the evidence that [its] mark had acquired secondary meaning at the time [Hybrid] began [its] allegedly infringing activities." *Morgans Grp.*, 2012 WL 1098276, at *5. Plaintiff's claim under Section 43(a) of the Lanham Act therefore fails as a matter of law.[9] *Rockland Exposition*, 894 F. Supp. 2d at 324 (collecting cases).

## IV.   CONCLUSION

For the foregoing reasons, summary judgment should be granted (i) barring Plaintiff's claims on the grounds of laches, (ii) deeming that Hybrid's rights in its HYBRID marks are superior to Plaintiff's rights in the Asserted Marks or in the alternative, that Plaintiff, as a matter of law, cannot establish superior trademark rights, and (iii) dismissing Plaintiff's claims against all of the Defendants.

Dated: New York, New York
        September 28, 2015

                                        Respectfully submitted,


                                        By: /s/ Mark J. Rosenberg
                                             Mark J. Rosenberg

---

[9] Plaintiff's New York State law claims fail as Plaintiff cannot demonstrate that (i) its HYBRID mark possessed secondary meaning at the relevant time and (ii) Hybrid acted in bad faith. *Rockland Expositions*, 894 F. Supp. 2d at 327-29.