Mark J. Rosenberg
Debra Bodian Bernstein
Christopher M. Tumulty
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, New York 10018
Telephone:  212-216-8000
Facsimile:  212-216-8001
mrosenberg@tarterkrinsky.com
dbernstein@tarterkrinsky.com
ctumulty@tarterkrinsky.com

*Attorneys for Defendants Hybrid Promotions, LLC,
Jarrod Dogan, Gavin Dogan and Jeff Caldwell*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE FASHION EXCHANGE LLC,

          Plaintiff,

     v.

HYBRID PROMOTIONS, LLC, *et al.*,

          Defendants.

No. 1:14-cv-01254 (SHS)

## DEFENDANT HYBRID PROMOTIONS LLC'S, JARROD DOGAN'S, GAVIN DOGAN'S AND JEFF CALDWELL'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT ...................................................................1

II.    ARGUMENT ............................................................................................3

    A.    Hybrid Did Not Abandon Its HYBRID, HYBRID TEES and HYBRID PROMOTIONS Marks       3

        1.    Hybrid Never Stopped Using its HYBRID TEES Mark ...................................3

        2.    Plaintiff's Assertion Of Abandonment Was Made In Bad Faith ................................................................................5

    B.    Hybrid Did Not Abandon Its HYBRID Mark       8

        1.    Hybrid's Retailers Continue to Use the HYBRID Mark ...................................8

        2.    Trademark Tacking Precludes the Abandonment of the Hybrid's HYBRID PROMOTIONS, HYBRID and HYBRID TEES Mark ...................................................................9

            a.    The Transition from HYBRID PROMOTIONS to HYBRID .................11

            b.    The Transition from HYBRID to HYBRID TEES ..................................12

            c.    The Addition of the HYBRID APPAREL Mark .....................................13

            d.    In the Alternative, Hybrid's Rights in its HYBRID APPAREL Mark Track Back to 2003 ......................................14

    C.    Hybrid's Fraud on the USPTO Counterclaim Should Not Be Dismissed ...........16

        1.    Plaintiff Submits No Evidence of Use of Its Mark on All of the Registered Goods ...........................................................20

        2.    Plaintiff's Intent to Deceive Can Be Inferred from the Circumstances ....................................................................23

III.    CONCLUSION......................................................................................25

i

## I.        PRELIMINARY STATEMENT

Plaintiff's motion for summary judgment motion is odd.  It does not seek a declaration that Plaintiff possesses superior trademark rights.  In fact, Plaintiff's motion does not even contain a statement that Plaintiff possesses such rights.  Other than its CEO's self-serving deposition testimony, Plaintiff presents no evidence that it and its alleged predecessors have used the HYBRID and HYBRID & COMPANY marks (collectively, the "Asserted Marks") since 1996.  And the motion presents no evidence supporting the Asserted Marks' claimed chain of title.  Simply put, Plaintiff submits no evidence in support of its position that it possesses superior trademark rights, a prerequisite to bringing a trademark or unfair competition claim.

Instead, Plaintiff focuses its motion entirely on Hybrid's counterclaims.  Plaintiff's motion is wrong as a matter of fact and as a matter of law.  Plaintiff's contention that Hybrid permanently ceased use of its HYBRID TEES and HYBRID marks is simply not true.  Had Plaintiff bothered to review the neck labels and hang tags of Hybrid's garments made available to Plaintiff in response to its document requests or simply reviewed Hybrid's retailers' websites, Plaintiff would have known that Hybrid's use of it HYBRID and HYBRID TEES marks never ceased, let alone permanently ceased.  There is no question of fact as to whether Hybrid abandoned its HYBRID and HYBRID TEES.  It did not.  The only question raised by this aspect of Plaintiff's motion is whether Plaintiff brought it in good faith.

Even though the Court's orders regarding summary judgment contemplated motions regarding the ownership and priority of the parties' respective trademarks, Plaintiff moves for summary judgment with respect to Hybrid's counterclaim based upon Plaintiff's fraud on the United States Patent and Trademark Office ("USPTO").  This counterclaim is based on Plaintiff

twice submitting false declarations to the USPTO regarding its use of the HYBRID & COMPANY mark.

Plaintiff's motion is a transparent effort to shift the blame for filing false declarations away from Plaintiff and onto other persons who were acting at Plaintiff's direction and on its behalf.  Plaintiff contends that since these persons lacked relevant knowledge, their submission of false statements to the USPTO, made while acting on Plaintiff's behalf, somehow absolves Plaintiff and demonstrates a lack of intent to defraud the USPTO.  Or, to put it more plainly, Plaintiff's use of an unknowledgeable third party to sign another third party's name to a false declaration (without the "signatory's" knowledge or authorization) precludes a finding of an intent to deceive the USPTO.

Plaintiff's efforts at plausible deniability raise questions of fact which preclude the granting of summary judgment.  While Plaintiff attempts to deflect blame, completely absent from Plaintiff's motion is a sworn statement from Plaintiff that it was using the HYBRID & COMPANY mark on all of the goods identified in its registration on the two critical trademark registration dates.  Instead, Plaintiff once again hides behind a third party, this time its attorney, by using Plaintiff's unverified response to Hybrid's Requests for Admission as "proof" of Plaintiff's use of the HYBRID & COMPANY mark.  Plaintiff's continued reluctance to assert under penalty of perjury that Plaintiff used the HYBRID & COMPANY mark on all of the goods identified in its registration on the critical dates speaks volumes.

All told, Plaintiff's motion must be seen for what it is – a tacit acknowledgement that it cannot prevail on its affirmative claims.  Plaintiff's motion must be denied.[1]

---

[1] In opposition to Plaintiff's motion, Hybrid relies upon and incorporates herein the papers submitted in support of Hybrid's Motion for Summary Judgment, Dkts. 154-157.

## II.    ARGUMENT

    A.    Hybrid Did Not Abandon Its HYBRID, HYBRID TEES
        and HYBRID PROMOTIONS Marks

        1.    Hybrid Never Stopped Using its HYBRID TEES Mark

Plaintiff's assertion that Hybrid ceased using and thus abandoned its HYBRID TEES mark is blatantly false.  Hybrid *never* ceased using its HYBRID TEES mark.  Since in or about 2003, hangtags bearing the HYBRID TEES mark have been and continue to be affixed to most of the garments Hybrid has sold to JC Penney.  (Dogan Oct. 23, 2015 Decl. at ¶¶ 4-5; Carpenter Decl. at ¶¶ 2-4, Exs. 1-2).  In addition, Hybrid never stopped using the HYBRID TEES mark in the neck labels of garments it sold to retailers such as Sears and Shopko.  Hybrid's trademark use is shown in the HYBRID TEES garments made available for Plaintiff's inspection in January 2015, which garments bear production dates of May and September 2014.  (*Id.* at Dogan Oct. 23, 2015 Decl. at ¶¶ 7-10; Lemirande Decl. at ¶¶ 2-3, Ex. 1; Wagner Decl. ¶¶ 2-3, Ex. 1).  Likewise, retailers such as Kohl's and Target have, with Hybrid's authorization, used the HYBRID TEES mark in connection with their Internet sales of Hybrid's goods since 2006.  (Dogan Sept. 28, 2015 Decl. at ¶¶ 31-32, Exs. 12-13; Dogan Oct. 23, 2015 Decl. at ¶ 6).  None of this uncontroverted evidence shows that Hybrid ceased use of the HYBRID TEES mark with the intent not to resume use.  Instead, the evidence shows that Hybrid *never* ceased use of the HYBRID TEES mark.  Such use has been continuous.  Hybrid's continued use of its HYBRID TEES mark does not present a question of fact.  It is a material fact that is beyond dispute.

All of this comports with the deposition testimony of Jarrod Dogan, who repeatedly testified that Hybrid continues to use its HYBRID TEES mark.  *See* Zarin Decl. (Dkt. 161) at Ex. Q at 175:11-176:4 ("we still ship Hybrid Tees"); 176:21-177:8 ("I'm not certain how much Hybrid Tees are out there ... but we still have different labels … that go into the T-shirts. Some

3

are Hybrid Tees").  Although Plaintiff points to a portion of Mr. Dogan's testimony wherein he stated that Hybrid had not used its HYBRID TEES mark on *neck labels* during certain years, (Pltf. Mem. at 14), the sample garments made available for inspection by Sears and Shopko in January 2015 speak for themselves. (Lemirande Decl. at ¶¶ 2-3, Ex. 1; Wagner Decl. ¶¶ 2-3, Ex. 1). This portion of Mr. Dogan's testimony *was not directed to hangtags*.  Based on the evidence made available by Shopko and Sears, Mr. Dogan's testimony was simply incorrect and speaks to the fact that Hybrid does not track which of its marks are placed on the goods its sells.  (Dogan Sept. 28 Decl. at ¶ 28).  In this connection, Mr. Dogan was deposed in his personal capacity and not as a Rule 30(b)(6) witness.

Finally, Plaintiff's contention that Hybrid abandoned its HYBRID TEES mark because Hybrid no longer uses that mark as the name of its business is absurd.  (Pltf. Mem. at 16-18). Plaintiff appears to not appreciate the difference between a service mark and a trademark. While Hybrid has phased out HYBRID TEES as a service mark (a word or name used by a person "to identify and distinguish the services of one person … from the services of others and to indicate the source of the services", 15 U.S.C. § 1127), the evidence shows that Hybrid has never ceased using HYBRID TEES as a trademark (a word or name used by a person to identify and distinguish his or her goods … from those manufactured or sold by others and to indicate the source of the goods." *Id.*).

*Brown & Brown, Inc. v. Cola*, No. 10–3898, 2011 WL 1103867, at *12 (E.D. Pa. Mar. 23, 2011), cited extensively by Plaintiff, does not support Plaintiff's theory.  (Pltf. Mem. at 16-17).  *Brown & Brown* concerned the phasing out of one service mark and transitioning to another service mark.  Unlike Hybrid's continuing use of HYBRID TEES as a *trademark* while phasing out the same as a *service mark*, the trademark owner in *Brown & Brown* lacked an ongoing and

continuing use of a trademark.  Hybrid's phasing out of HYBRID TEES as a service mark while retaining that mark as a trademark is akin to a trademark registrant who owns a single registration for a mark which registration covers two classes – one for goods and one for services.  The registrant may surrender the registration for cancelation at any time with respect to one class with the registration remaining in effect for the remaining class.  *See* 37 C.F.R. §2.172. When a trademark owner such as Hybrid uses a mark as both a service mark and trademark, the law permits the trademark owner to cease using the mark to identify its services without affecting the owner's continuing rights in the mark when used to identify the source of its goods. *Cf.* 2 McCarthy at §17:23 ("There is no abandonment or break in the chain of priority of use merely because use of the mark is shifted from one line of goods or services to another similar line.  Even when it is the user's clear intention to cease sales of one kind of goods under the mark, continuance or commencement of sales of closely related goods under the mark is not abandonment of the mark and the earlier use may be relied upon for priority purposes.").

> 2.    Plaintiff's Assertion Of Abandonment Was Made In Bad Faith

Plaintiff contention that Hybrid abandoned its HYBRID TEES trademark is simply remarkable. At all relevant times, Plaintiff and its counsel knew or should have known that Hybrid's use of that mark never ceased.   Specifically, in October 2014, Plaintiff served document requests on *all* of the Defendants.  Document Request No. 16 sought "[s]amples of any and all goods created, manufactured, produced, sold, distributed, promoted, marketed or advertised by Retailer Defendants, from 1999 through the present, which bear the trademark HYBRID."  (Dkt. 95-3 at 8-9, 14-15)

On December 4, 2014, the Retailer Defendants moved, *inter alia*, to strike Request No. 16 on the grounds that it sought discovery outside of the scope of discovery permitted by the

Court's July 23, 2014 Order.  (Dkt. 95 at 2-3).  Plaintiff opposed the Retailer Defendants' motion, asserting, *inter alia*, that Request No. 16 was "permissible" under the Court's Order as "Plaintiff *obviously must* obtain samples of goods which display Defendants' HYBRID trademark."  (Dkt. 96 at 3, 5) (emphasis added).  The Court, while largely granting the Retailer Defendants' motion to strike, denied the part relating to Request No. 16.  (Dkt. 99).

In view of the Court's Order, each of the Retailer Defendants served on Plaintiff a supplemental response to Request No. 16.  Each of the Retailer Defendants' supplemental responses stated in pertinent part, "[s]ubject to and notwithstanding the foregoing objections, [Retailer Defendant] will make responsive samples, if any, available for inspection at its offices." (Rosenberg Oct. 26, 2015 Decl. at Exs. 1-3).  Plaintiff did not object to any of these supplemental responses.  Since January 2015, Retailer Defendants have been holding samples of HYBRID goods for inspection.  *See* Wagner Decl. at ¶ 3; Carpenter Decl. at ¶ 4; Lemirande Decl. at ¶ 3).  Even though Plaintiff stated to the Court that Plaintiff "obviously must" obtain such samples, Plaintiff and its counsel never inspected any of them, let alone requested such an inspection.  Had they done so, they would have seen that the garments set aside early this year by Retailer Defendants such as Sears, JC Penney and Shopko bore the HYBRID TEES mark on either the garment's neck label or hang tag.  Indeed, some of these garments even have the production dates (May and September 2014) stamped on their neck labels.[2]

It is egregious for Plaintiff to base a motion on a supposed lack of evidence when the supposed lack of evidence was a direct result of Plaintiff and its counsel's willful failure to

---

[2] It is hard to believe that neither Plaintiff (which is located in Manhattan's Garment District) nor its counsel (which is located across from Penn Station) as part of their pre-suit investigation of Plaintiff's claims or during discovery never (i) ventured to the JC Penney at Herald Square to observe how Hybrid's goods are displayed or (ii) reviewed the display of Hybrid's goods on the Retailer Defendants' websites.  Had they done so, they would have observed the ongoing use of the HYBRID TEES mark.

review the evidence made available to them.  Again, this is evidence which Plaintiff represented to the Court that it "obviously must" have.  Plaintiff's willful blindness can neither support a motion for summary judgment nor create an issue of fact.  Instead, it raises questions as to Plaintiff's and its counsel's bad faith. Was Request No. 16 interposed for the purpose of harassing the Retailer Defendants?  Why did Plaintiff represent to the Court that it "obviously must" have such evidence?  And, should Plaintiff and its counsel be sanctioned for making a motion based on their willful blindness?  *Chambers v. NASCO, Inc*., 501 U.S. 32, 43–44 (1991) (courts are vested with the inherent power to sanction parties who abuse the judicial process or perpetrate fraud upon the court); *Suntrust Mortg., Inc. v. AIG United Guar. Corp.*, No. 3:09cv529, 2011 WL 1225989, at *21 (E.D. Va. Mar. 29, 2011) (collecting case) ("Issuing sanctions upon a finding of willful blindness is squarely in line with the sanctions standards articulated by the Supreme Court in *Chambers* … Issuing sanctions for willful blindness on these facts hews closely to *Chambers* in that it reserves inherent-authority sanctions for the most egregious of conduct engaged under circumstances that are tantamount to knowing."); *McMunn v. Mem'l Sloan–Kettering Cancer Ctr*., 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) (quotation omitted) ("[A] fraud on the court occurs . . .when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process" in an attempt to "hinder the fact finder's fair adjudication of the case and his adversary's defense of the action").[3]

---

[3] Plaintiff and its counsel's making a motion based on their willful blindness is entirely consistent with their conduct throughout this case.  Plaintiff commenced this action by naming ten of Hybrid's retailers as defendants even though these retailers never sold goods bearing any of the HYBRID Marks.  During discovery, Plaintiff lost two motions to compel, lost a motion made pursuant to Fed. R. Civ. P. 36(a)(6), had a preclusion order entered against it and served discovery requests that were stricken because they exceeded the scope of the Court's discovery Order.  *See* Dkts. 99, 110, 131.  Should the Court grant Hybrid's Motion for Summary Judgment,

B.     Hybrid Did Not Abandon Its HYBRID Mark

1.     Hybrid's Retailers Continue to Use the HYBRID Mark

Hybrid's use of its HYBRID mark without additional word elements has never ceased. Commencing long prior to the commencement of this action and continuing to the present, Hybrid's retailers such as Macy's, Sears and JC Penney have used the HYBRID mark without additional elements in connection with their sales of Hybrid's goods.  (Dogan Sept. 28, 2015 Decl. at ¶¶ 31-32; Exs. 10-11, 14; Dogan Oct. 23, 2015 Decl. at ¶ 6; Gagnon Decl. at ¶¶ 2-4, Ex. 1).  In addition, since at least as early as February 2012, two years before the commencement of this action, Belk, when displaying Hybrid's goods on its website at www.belk.com (the "Belk Website") has used and continues to prominently use the "TM" symbol next to the word "Hybrid."  In 2013, Belk optimized the visible content of the Hybrid page of the Belk Website to include the phrases "Hybrid apparel," "Hybrid clothing" and "buy Hybrid online."  The Hybrid page on the Belk Website features apparel distributed by Hybrid Promotions.[4]  (Gagnon Decl. ¶¶ 2-4; Ex. 1).

Hybrid's retailers' use of Hybrid's HYBRID mark has always been with the authorization of Hybrid and subject to Hybrid's quality control efforts.   (Dogan Oct. 23, 2015 Decl. at ¶ 6; Dogan Sept. 28, 2015 Decl.  at ¶¶ 46-49).  Simply put, implied licenses exist between Hybrid and its retailers.  *University Book Store v. University of Wisconsin Board of Regents*, 33 U.S.P.Q.2d 1385, at *10 (T.T.A.B. 1994) (finding of abandonment precluded where implied licenses existed between trademark owner and retailers selling goods bearing owner's

---

Hybrid intends to have this case declared exceptional under 15 U.S.C. § 1117(a) and seek its attorney's fees.

[4] The Belk retail store closest to New York is in located in Virginia.  Presumably, Plaintiff or its counsel, both of which are located in Manhattan, reviewed the Hybrid portion of the Belk Website before commencing this action.

trademark); 3 McCarthy on Trademarks, § 18:46 ("Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee"); *First Fashion USA, Inc. v. Best Hair Replacement Mfrs., Inc.* 645 F. Supp.2 d 1158, 1165 (S.D. Fla. 2009) ("Permission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no contract was made").

Where a trademark license exists, the use of the mark inures to the benefit of the trademark owner. 3 McCarthy at § 18:52; *Quality Candy Shoppes/Buddy Squirrel of Wisconsin, Inc. v. Grande Foods*, 90 U.S.P.Q.2d 1389 at *4 (T.T.A.B. 2007) ("[Y]ears of precedent make it very clear that proper use of a mark by a trademark owner's licensee or related company constitutes 'use' of that mark attributable to the trademark owner").

Accordingly, Hybrid's retailers' years of use of the HYBRID mark in connection with their sales of Hybrid's goods inures to the benefit of Hybrid.  Because this use has never ceased, Hybrid cannot have abandoned its HYBRID mark.

2. Trademark Tacking Precludes the Abandonment of the Hybrid's
HYBRID PROMOTIONS, HYBRID and HYBRID TEES Mark

Even if Hybrid is deemed to have ceased use of its HYBRID mark standing alone, without additional elements, such a determination is not dispositive of the issues of (i) whether Hybrid abandoned that mark and (ii) whether its priority rights date back to 1998.[5]  That is

---

[5] Plaintiff tries to make hay out of Hybrid's lack of evidence of and fading memories regarding Hybrid's use of its HYBRID mark.  (Pltf. Mem. at 5-8).  This lack of evidence and fading recall is a direct result of Plaintiff's sixteen year delay in commencing this action and evidences the prejudice to Hybrid as a result of this delay.  *See* Dogan September 28. 2015 Decl. at ¶¶ 62-63 (regarding the evidence no longer available to Hybrid).  *See also Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 137 (E.D.N.Y. 2012) (party raising laches

because trademark owners such as Hybrid are permitted to make modifications to their marks without losing their priority rights.  As the Supreme Court recently noted,

> Recognizing that trademark users ought to be permitted to make certain modifications to their marks over time without losing priority, lower courts have provided that, in limited circumstances, a party may clothe a new mark with the priority position of an older mark. This doctrine is called "tacking," and lower courts have found tacking to be available when the original and revised marks are "legal equivalents" in that they create the same, continuing commercial impression.

*Hana Financial, Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015).

Tacking enables a trademark owner to add time spent using an older mark to the time spent using a newer mark if both marks create the same commercial impression so that consumers "consider both as the same mark."  *Id.* at 910 (quotation omitted); *Navistar Intern. Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 911776, at *2 (N.D. Ill. Dec. 28, 1998) *citing Lincoln Logs, Ltd. v. Lincoln Pre–Cut Log Homes, Inc.*, 971 F.2d 732, 735 (Fed.Cir.1992); 2 McCarthy § 17:26 ("[N]either abandonment nor loss of the ability to tack-on to achieve priority will occur if the new form of the mark creates the same commercial impression as did the old form.").

Tacking is permitted because "[t]rademark rights inure in the basic commercial impression created by a mark, not in any particular format or style." *Navistar*, 1998 WL 911776 at *2 *quoting* 2 McCarthy at § 17:26. This flexibility in trademark law allows users to modernize their trademarks without losing years of accumulated value in, or goodwill toward, their trademarks.  *Id.*; *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036,

---

defense "affirmatively establishes actual prejudice when it shows that the passage of time has made evidence unavailable or difficult to obtain") (citation omitted).  In addition, it is noted that neither Mr. Dogan nor Mr. Lederman were designated as Rule 30(b)(6) witnesses.  Rather, Plaintiff deposed them in their individual capacity.

1048 (9th Cir. 1999) ("Without tacking, a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles."). Thus, "[m]inor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment [when determining priority of use]." *Navistar*, 1998 WL 911776 at *2 *quoting Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir.1992). In determining whether to tack two marks, the general rule is that two marks may be tacked "when the original and revised marks are 'legal equivalents.' This term refers to two marks that create the same, continuing commercial impression so that consumers consider both as the same mark." *Hana Financial*, 135 S. Ct. at 910. A determination as to whether two marks may be tacked can be made on a motion for summary judgment. *Id*. at 911.

a.      The Transition from HYBRID PROMOTIONS to HYBRID

In or about 1999, Hybrid began to transition from its HYBRID PROMOTIONS mark for use in connection with designing and distributing promotional apparel to HYBRID for use on t-shirts. (Dogan Sept. 28, 2015 Decl.  at ¶ 7). With this transition, Hybrid retained the key element of its mark – HYBRID – and deleted the descriptive term PROMOTIONS. Both marks, used in connection with nearly identical goods and services, retained the same continuing commercial impression. As such, Hybrid did not abandon its priority rights when it transitioned from HYBRID PROMOTIONS to HYBRID as these two marks are legal equivalents. *Sands, Taylor & Wood Co.*, 978 F.2d 947, 955 (7th Cir.1992) (no abandonment where trademark owner changed mark THIRST–AID FIRST AID FOR YOUR THIRST to THIRST-AID as mark retained "key element"); *see also Puritan Sportswear Corp. v. Shure,* 307 F. Supp. 377 (W.D.

11

Pa. 1969) (change from PURITAN SPORTSWEAR, THE CHOICE OF ALL AMERICANS to PURITAN not abandonment); *Proxite Products, Inc. v. Bonnie Brite Products Corp*., 206 F. Supp. 511, 514 (S.D.N.Y. 1962) (change from PROX BONNIE BLUE to BONNIE BLUE not abandonment. "[T]he dropping of the word PROX under these circumstances did not work an abandonment of plaintiff's trademark").

b.   The Transition from HYBRID to HYBRID TEES

In or about 2003, Hybrid began to transition from its HYBRID mark for use on t-shirts to HYBRID TEES for use on t-shirts as well as in connection with the design, sourcing, production and distribution of t-shirts. (Dogan Sept. 28, 2015 Decl. at ¶¶ 16-18).  In this transition, Hybrid retained the key element – HYBRID – and simply added the descriptive term TEES to its HYBRID mark.  In order to reinforce and continue the impression created by its HYBRID mark, starting in 2003 many of the neck labels placed on Hybrid's goods depicted the dominant HYBRID element of the mark in large letters, while the descriptive TEES element was placed below HYBRID in much smaller letters.  (Dogan Sept. 28, 2015 Decl. at Ex. 7 at HP000260, 000264, 000271).  The same emphasis on the HYBRID element was used on Hybrid's signage. (*Id.* at Exs. 23-24).  As the garments made available for inspection by Sears and Shopko show this practice never ceased.  (Wagner Decl. at Ex. 1; Lemirande Decl. at Ex. 1).

Simply put, the addition of the descriptive element TEES to the dominant element HYBRID did not change the commercial impression created by the HYBRID mark.  The mark "retain[ed] its impact and symbolized a continuing commercial impression."  2 McCarthy at § 17:25.  As Mr. Dogan testified, "Our retailers have always known us as Hybrid."  (Zarin Decl. (Dkt. 161) at Ex. Q at 156:9).  These two marks are legal equivalents.  Hybrid's addition of the descriptor TEES to HYBRID is thus covered by the tacking rule.  *D & J Master Clean, Inc. v.*

*Servicemaster Co.*, 181 F. Supp. 2d 821, 825 (S.D. Ohio 2002) (addition of descriptive term to trademark which identified the services provided under the mark "does not change the basic commercial impression of the [mark]"); *American Security Bank v. American Security and Trust Company,* 190 U.S.P.Q. 271 (T.T.A.B. 1976), *aff'd,* 571 F.2d 564 (C.C.P.A. 1978) (Change from AMERICAN SECURITY to AMERICAN SECURITY BANK did not alter commercial impression of the mark. Tacking permitted); *see also McCabe-Powers Auto Body Co. v. Am. Truck Equip. Co.,* 150 F. Supp. 194(D. Or. 1957) (AMERICAN changed to POWERS-AMERICAN, no abandonment of rights in AMERICAN).   Accordingly, Hybrid's priority rights in its HYBRID TEES mark tack back to Hybrid's first use of HYBRID PROMOTIONS in 1998 or, in the alternative, its first use of HYBRID in 1999.

### c.     The Addition of the HYBRID APPAREL Mark

In or about 2010, Hybrid began doing business under the service mark HYBRID APPAREL.  It also began using HYBRID APPAREL as a trademark on its goods.  (Zarin Decl. (Dkt. 161) at Ex. Q at 153:15-19; 155:22-157:22).  Once again, Hybrid retained the key element – HYBRID – and added a descriptive term - APPAREL - to the mark.  As with Hybrid's HYBRID and HYBRID TEES mark, its HYBRID APPAREL mark was and continues to be used on and in connection with the design, sourcing, production and distribution of t-shirts as well as a broader array of apparel.  (*Id.* at 155:22-156:4).  In order to reinforce and continue the impression created by its HYBRID mark, Hybrid's signage and many of the neck labels placed on Hybrid's goods depicted the dominant HYBRID element of the mark in large letters, while the descriptive APPAREL element was placed below HYBRID in much smaller letters.  (Dogan Sept. 28, 2015 Decl.  at Ex. 7 at HP 001038, 001044, 001048, Exs. 26-27).

With respect to the commercial impression created by the HYBRID mark, the addition of the descriptor APPAREL changed nothing. The HYBRID mark, which has always been used in connection with apparel, "retain[ed] its impact and symbolized a continuing commercial impression." 2 McCarthy at § 17:25. Again, as Mr. Dogan testified, "Our retailers have always known us as Hybrid." (Zarin Decl. (Dkt. 161) at Ex. Q at 156:9). HYBRID and HYBRID APPAREL are legal equivalents. Hybrid's addition of the descriptor APPAREL to HYBRID is thus covered by the tacking rule. *D & J Master Clean,* 181 F. Supp. 2d at 825.

Accordingly, Hybrid's priority rights in its HYBRID APPAREL mark date back to its first use of HYBRID PROMOTIONS in 1998 or, in the alternative, its first use of HYBRID in 1999.

> d.   In the Alternative, Hybrid's Rights in its
>        HYBRID APPAREL Mark Tack Back to 2003

Assuming, *arguendo*, that Hybrid's priority rights in its HYBRID APPAREL mark do not date back to either 1998 or 1999, they do date back to at least 2003, the date when Hybrid began using its HYBRID TEES mark. Changing HYBRID TEES to HYBRID APPAREL did not change the commercial impression of the mark. The descriptive term TEES (a type of shirt) is merely a subset of the descriptive term APPAREL. Reinforcing this continuum, the logo designs HYBRID has used and continues to use for both HYBRID TEES and HYBRID APPAREL are nearly identical, with APPAREL simply replacing TEES. (*See* Dogan Sept. 28, 2015 Decl. at Ex. 7 at HP001038, HP001044, Ex. 15 and *compare to Id.* at Ex. 7 at HP000271; HP000273; Wagner Decl. at Ex. 1; Lemirande Decl. at Ex. 1). The commercial impressions created by HYBRID TEES and HYBRID APPAREL are the same. As such, the two marks are legal equivalents. Accordingly, Hybrid's priority rights in HYBRID APPAREL date back to at least 2003, the date of first use of its HYBRID TEES mark. *Hess's of Allentown, Inc. v.*

*National Bellas Hess, Inc.*, 169 U.S.P.Q. 673 (T.T.A.B. 1971) (Tacking permitted where HESS BROTHERS was changed to HESS'S OF ALLENTOWN, INC., because HESS was the most prominent and significant part of both the old and new marks). A party claiming priority by tacking onto an older mark may use both the new mark and old mark simultaneously so long as the two marks create the same commercial impression. *Navistar*, 1998 WL 911776, at *3.

As explained in Hybrid's Memorandum of Law in Support of its Motion for Summary Judgment, because of the broken chain of title, Plaintiff's rights in its asserted HYBRID and HYBRID & COMPANY marks date back to November 2006 at the earliest. (Dkt. 154 at 15-20). As set forth above, Hybrid's rights in its HYBRID APPAREL mark date back to 2003 at the latest and 1998-99 at the earliest. Plaintiff admits that Hybrid owns the HYBRID APPAREL mark. (Pltf. Mem. at 18). In view of Plaintiff's admission, Plaintiff effectively conceded that the Hybrid's rights in its HYBRID APPAREL mark are superior to Plaintiff's rights in the asserted marks. As a matter of law, Plaintiff's trademark and unfair competition claims must fail. *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1321 (11th Cir. 2011) (citations omitted) (plaintiff asserting common law trademark rights bears "the burden of proving its prior use").

\* \* \*

The party asserting abandonment bears the burden of persuasion with respect to both non-use and lack of intent to resume use in the reasonably foreseeable future. *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 146 (2d Cir. 2007). The Second Circuit has held that, because abandonment involves a forfeiture of a property interest, the elements of the defense must be strictly proved, and statutory aid to such proof must be narrowly construed. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980), *see also Pilates, Inc. v. Current*

*Concepts, Inc.* 120 F. Supp. 2d 286, 295 (S.D.N.Y. 2000) (requiring clear and convincing evidence for abandonment defense). Plaintiff has not come close to meeting this burden. It is beyond genuine dispute that Hybrid never ceased using its HYBRID TEES mark. And, because of (i) the Retailer Defendants' use of Hybrid's HYBRID mark and (ii) tacking with respect to Hybrid's HYBRID and HYBRID PROMOTIONS mark, neither of these marks has been abandoned. Plaintiff cannot meet its burden of showing otherwise. Accordingly, Plaintiff's motion for summary judgment on the issue of abandonment must be denied in its entirety.

> C.   Hybrid's Fraud on the USPTO Counterclaim
>       <u>Should not be Dismissed</u>

In seeking to dismiss Hybrid's fraud on the USPTO claim, Plaintiff makes admissions which raise issues of fact as to Plaintiff's intent, thus precluding summary judgment. Indeed, these admissions that the Statement of Use and Declaration of Use filed with the USPTO were not actually signed by the individuals whose signatures appear thereon, strongly suggest that Plaintiff's HYBRID & COMPANY registration should, at a minimum, be deemed void as a result of Plaintiff's less-than-honest acts and failure to abide by the guidelines governing the filing of documents with the USPTO.

Specifically, Hybrid seeks to cancel the registration for Plaintiff's HYBRID & COMPANY mark due to fraud on the USPTO, based on Plaintiff's material misrepresentations to the USPTO concerning the goods on which the mark have been used. The elements of a claim for cancellation of a registration due to fraud on the Trademark Office are: (1) a false representation regarding a material fact; (2) the person making the representation knew or should have known that the representation was false; (3) an intention to induce the listener to act or to refrain from acting in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damage resulting from such reliance. *See, e.g., Patsy's Italian*

16

*Restaurant, Inc. v. Banas*, 658 F.3d 254, 270-71 (2d Cir. 2011).   All of these elements are present here.

In its Statement of Use under 15 U.S.C. § 1051(d) filed with the USPTO on or about July 22, 2009 in connection with the application for Plaintiff's HYBRID & COMPANY mark, Plaintiff, by its attorney, Gilbert Lee Sandler, falsely stated that Plaintiff was using the HYBRID & COMPANY mark in commerce on or in connection with *all* of the goods and services identified in the application (the "Registered Goods").   (Dkt. No. 161 at Ex. K).   Mr. Sandler's declaration accompanying the Statement of Use was made pursuant to 18 U.S.C. § 1001, and expressly states that "such willful false statements may jeopardize the validity of the form or any resulting registration … and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true."   *Id.*

In its motion papers, Plaintiff notes that at his deposition, Mr. Sandler testified that he did not prepare the statement, but, rather, it was prepared by a paralegal at his law firm.   (Pltf. Mem. at 20).   Mr. Sandler stated that he was "certain" he reviewed the statement before signing it, but did not recall specific discussions with either his paralegal or Plaintiff concerning the information contained in the Statement of Use.   (Rosenberg Oct. 26, 2015 Decl. at Ex. 4 at 18:25-19:1).   Likewise, Plaintiff's CEO Jack Saadia denied any recollection of specific conversations, but stated that he "communicated" with Mr. Sandler's firm regarding the trademark use information contained in the Statement of Use.   (Rosenberg Oct. 15, 2015 Decl. at Ex. 5 at 85:23-86:2).   As Mr. Sandler was directed by Plaintiff and signed the statement not in his personal capacity, but as a representative of Plaintiff, Plaintiff is accountable for the false representations made in the Statement of Use.   That is because Mr. Sadler was acting as Plaintiff's agent, and "'it is a basic tenet of the law of agency that the knowledge of an agent …

is imputed to the principal.'"   *S.E.C. v. K.K. Freeland and Co. Inc.*, No. 91 Civ. 7986, 1993 WL 33659 at *7 (S.D.N.Y. Feb. 1, 1993) ("attorneys are regarded as agents for their clients") *quoting Mallis v. Bankers Trust Co.,* 717 F.2nd 683, 689 n. 9 (2nd Cir.1983) and *citing Citizens Savings Bank, F.S.B. v. Verex Assurance Inc.,* 883 F.2nd 299, 302 (4th Cir.1989) (fraud of attorney at real estate closing binding upon client because "actual knowledge by the principal is not necessary to hold him liable for the frauds, deceits, misrepresentations and other malfeasances of the agent when the agent is acting within the scope of his agency.").  Notably, Plaintiff does not contend that Mr. Sandler filed the Statement of Use without its authorization.

In its Combined Declaration of Use and Incontestability Under Sections 8 & 15 filed with the USPTO on January 5, 2015 ("Declaration of Use"), Plaintiff compounded its fraud by falsely stating that the HYBRID & COMPANY mark was "still in use in commerce on or in connection with all goods/services listed" in the registration.  (Rosenberg Oct. 26, 2015 Decl. at Ex. 6).  The Declaration was signed by Mark Hanono, made pursuant to 18 U.S.C. § 1001 and expressly stated that "such willful false statements and the like may jeopardize the validity of this submission, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true."  *Id.*

Plaintiff did not submit the Declaration of Use with its motion papers.  Perhaps that is because the Declaration, which was filed during the pendency of both this action and the Cancellation Proceeding, contains the blatantly false statement "[t]here has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to the owner's right to register the same or to keep the same on the register; and *there is no proceeding involving said rights pending and not disposed of either in the United States Patent and Trademark Office or in a court*."  *Id.*

18

At his deposition in this action, Mr. Hanono testified that he did not prepare the Declaration of Use nor authorized anyone to place his electronic signature on the document. (Rosenberg Oct. 26, 2015 Decl. at Ex. 6; Zarin Decl. (Dkt. 61) at Ex. I at 51:12-54:19).  In its motion papers, Plaintiff acknowledges that the Declaration was not signed by Mr. Hanono, but was prepared and signed by a production manager at Plaintiff's licensee, Fame Fashion, Hazel Francisco.  (Pltf. Mem. at 21).  Plaintiff admits that Plaintiff's Chief Executive Officer, Jack Saadia, requested that Ms. Francisco prepare and file Declaration of Use, (*Id.* at 21), which Ms. Francisco preceded to prepare and file.  (Zarin Decl. at Ex. O at 8:21-15:21).

According to Plaintiff, Ms. Francisco, despite her admitted "absence of knowledge" regarding the use of Plaintiff's HYBRID & COMPANY mark, (Pltf. Mem. at 22), and her complete lack of trademark experience, (*Id.* at 21; Zarin Decl. Ex. O at p. 9:8-11),  "nonetheless confirmed that the trademark was being used in commerce in association with all the listed product categories."  (Pltf. Mem. at. 22).  Plaintiff does not explain how a person who lacks knowledge of specific facts can "confirm" the existence of those very facts.  Instead, Plaintiff suggests that Plaintiff should be absolved of blame because Ms. Francisco lacked knowledge of the trademark process and Plaintiff's use of its HYBRID & COMPANY mark.  (Pltf. Mem. at 22, 24).  That makes no sense given that Ms. Francisco was acting at the direction of Plaintiff's CEO.

Plaintiff further attempts to excuse the acts of Ms. Francisco on the grounds that she was not employed by Plaintiff on the date she prepared filed the Declaration of Use.  (Pltf. Mem. at 22).  It is axiomatic that Plaintiff cannot absolve itself of Ms. Francisco's conduct simply because she was not an employee of Plaintiff. After all, Ms. Francisco was acting on behalf of Plaintiff at the direction of its CEO, Jack Saadia, whom Ms. Francisco referred to as her one of

her "bosses." (Zarin Decl. (Dkt. 161) at Ex. O at Ex. 9 at 8:21-9:4).[6] *See Sec. Pac. Mortgage &*

*Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447, 448 (2d Cir.1989) (per curiam) (it is

an "established rule of agency law that a principal is liable to third parties for the acts of an agent

operating within the scope of the agent's real or apparent authority"); *see also Citibank N.A. v.*

*Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir.1989) ("[A] principal is liable for an agent's fraud

though the agent acts solely to benefit himself, if the agent acts with apparent authority"); 2A

N.Y. Jur.2d Agency & Indep. Contractors §§ 29091 ("[A] principal is liable for the fraudulent

acts of his or her agent committed within the scope of the agent's authority … liability for an

agent's fraud or misrepresentation applies even where the principal had no knowledge of the

misrepresentation or fraud and intended no fraud"). Ms. Francisco was acting at the direction of

Plaintiff's CEO, Jack Saadia,  Whether or not Ms. Francisco was an employee of Plaintiff is not

the issue.  Plaintiff appears to be aware of this as its papers are devoid of any assertion that Ms.

Francisco acted without Plaintiff's authority.

      1.     Plaintiff Submits No Evidence of Use
                of Its Mark on All of the Registered Goods

      Conspicuously absent from Plaintiff's motion papers is a sworn statement signed by

Plaintiff's principal attaching corroborating evidence which shows use the HYBRID &

COMPANY mark in commerce (as defined in 15 U.S.C. § 1127) on *all* of the registered goods

on both of the critical trademark registration dates.  If the HYBRID & COMPANY mark was

used in on *all* of the registered goods on both of the critical trademark registration dates, whether

Plaintiff possessed an intent to deceive would not be an issue.  While Plaintiff admits that it

never used its mark on gussets, the documents produced by Plaintiff in this action show, at most,

----

[6] Mr. Saadia is not an owner or employee of Fame Fashion. (Rosenberg Oct. 26, 2015 Decl. at Ex. 5 at 6:15-20; 12:9-10).

that the mark was used "in commerce," as that term is defined in 15 U.S.C. § 1127, on only approximately half of the over fifty goods identified in the registration, and not necessarily on the critical trademark dates.

In making the instant motion, Plaintiff again hides behind an unknowledgeable third party, this time its attorney.  In support of its contention that it was using the HYBRID & COMPANY mark in commerce on all of the goods identified in its registration on both of the critical registration dates, Plaintiff relies upon its response to Hybrid's Request for Admissions. (Dkt. 161, Ex. L).  This is its only "evidence." However, that response was signed by Plaintiff's attorney, who was not identified in Plaintiff's Fed. R. Civ. P. 26(a) disclosures as having knowledge of such facts.[7]  (Rosenberg Oct. 26, 2015 Decl. at Ex. 7).  Plaintiff's responses to Hybrid's Requests for Admissions were not served until August 5, 2015, long after the June 24, 2015 close of discovery. (Dkt. 115).  Notably, it took the Court's June 23, 2015 Order granting Hybrid's motion pursuant to Fed.R.Civ.P. 36(a)(6) to get Plaintiff to properly respond to the Request for Admissions, which Requests were served on March 30, 2015.  (Dkts. 119, 131). Many of Plaintiff's responses contradict the documentary record.  Because the Court's June 23, 2015 Order contemplated that motions by the parties for summary judgment would be limited to the issues of "ownership and laches," (Dkt. No. 131), and not Hybrid's fraud on the Trademark Office counterclaim, Hybrid did not seek leave to take additional discovery from Plaintiff

---

[7] Plaintiff's attorney claims that Exhibits G and H to his Declaration show "hang tags, labels and buttons imprinted with the trademark HYBRID & COMPANY used by Plaintiff on its clothing." (Dkt. 161 at ¶¶ 8-9).  Paragraphs 8 and 9 and Exhibits G and H to Plaintiff's counsel's declaration should be stricken as Plaintiff's counsel was not identified in Plaintiff's Rule 26(a) disclosures as having knowledge of Plaintiff's use of either of the Asserted Marks.  (Rosenberg Oct. 26, 2015 Decl. at Ex. 7).  Because Plaintiff's counsel was not identified in accordance with Rule 26(a)(1)(A)(i), Hybrid did not take discovery from him regarding his knowledge of Plaintiff's use of the HYBRID & COMPANY mark.

regarding the inconsistencies between Plaintiff's responses to Hybrid's Request for Admission and Plaintiff's document production.

In particular, Plaintiff produced no documents showing that as of July 22, 2009, the date Plaintiff filed its Statement of Use, Plaintiff was using or had ever used the HYBRID & COMPANY mark in commerce on or in connection with a significant number of goods identified in the Statement, including, but not limited to baby tops; bathing suits; body suits; clothing, namely, wrap-arounds; dress suits; dry suits; fabric sold as an integral component of finished clothing items, namely, men's, ladies' and childrens' outerwear in the nature of puffer jackets, coats, raincoats, wind resistant jackets, jerseys; judo suits; karate suits; mantles; mufflers; muscle tops; one-piece play suits; parts of clothing, namely, gussets for tights, gussets for stockings, gussets for bathing suits, gussets for underwear, gussets for leotards and gussets for footlets; play suits; rain suits; rugby tops; shifts; shirts for suits; shoulder wraps; ski suits; ski suits for competition; snowboarding suits; snow suits; suit coats; swaddling clothes; ties; track suits; and tube tops.

Likewise, Plaintiff produced no documents showing that as of January 5, 2015, the date Plaintiff filed its Declaration of Use, Plaintiff was using or had ever used the HYBRID & COMPANY mark in commerce on or in connection with a significant number of goods identified in the Declaration, including, but not limited to baby tops; bathing suits; body suits; clothing, namely, wrap-arounds; dress suits; dry suits; fabric sold as an integral component of finished clothing items, namely, men's, ladies' and childrens' outerwear in the nature of puffer jackets, coats, raincoats, wind resistant jackets, jerseys; judo suits; karate suits; mantles; mufflers; muscle tops; one-piece play suits; parts of clothing, namely, gussets for tights, gussets for stockings, gussets for bathing suits, gussets for underwear, gussets for leotards and gussets

for footlets; play suits; rain suits; rugby tops; shifts; shirts for suits; shoulder wraps; ski suits; ski suits for competition; snowboarding suits; snow suits; suit coats; swaddling clothes; ties; track suits; and tube tops.

2.   Plaintiff's Intent to Deceive Can Be Inferred from the Circumstances

Plaintiff comes perilously close to admitting the allegations of Hybrid's fraud on the USPTO counterclaim.  Plaintiff concedes that it engaged in improper conduct, stating the facts which underlie Hybrid's counterclaim "suggest inadvertence or mere negligence, or at worst gross negligence on Plaintiff's behalf."  (Pltf. Mem. at 24).  However, a party does not get to determine its own level of culpability.  Whether "these facts suggest" gross negligence or an intent to deceive is a question of fact that belongs in the hands of the jury, particularly because an intent to deceive can be inferred from the circumstances.  *See, e.g., In re Bose*, 580 F.3d 1240, at 1243-44 (Fed. Cir. 2009) ("because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence"); *Haggar Int'l Corp. v. United Co. for Food Industry Corp.*, 906 F. Supp. 2d 96, 107 (E.D.N.Y. 2012) (same citing *In re Bose*).

Here, Plaintiff's principal, through his affirmative acts, created a situation where he knew that the Declaration of Use would be inaccurate.  By asking a person who Plaintiff admits lacked knowledge of trademarks and Plaintiff's use of its mark - Ms. Francisco, to prepare the Declaration of Use, Mr. Sadia effectively guaranteed that the Declaration would be false. Certainly, questions of fact exist as to whether Plaintiff intended to deceive the USPTO.

Plaintiff's argues that it lacked the requisite intent because, at its direction and with its authorization, third parties lacking relevant knowledge submitted false declarations to the USPTO.  This is absurd and makes a mockery of the trademark registration process.  It is also a classic attempt at plausible deniability as Plaintiff tries to absolve itself of responsibility by

hiding behind the acts of third parties who acted on its behalf.  An applicant for registration of a trademark "is required to exercise uncompromising candor in his communications with the United States Patent and Trademark Office, lest any registration he obtains will be invalid and/or unenforceable."  *T.A.D. Avanti, Inc. v. Phone-Mate, Inc.*, 199 U.S.P.Q. 648, 653 (C.D. Calif. 1978). *See also Orient Exp. Trading Co. v. Federated Dep't Stores, Inc.*, 6 U.S.P.Q.2d 1308 (2d Cir. 1988) (noting the "uncompromising candor" that is required of applicants before the USPTO).   Certainly, having unknowledgeable third parties submit false declarations on Plaintiff's behalf evidences a lack of candor.  Moreover, 37 C.F.R. § 2.193(a) expressly requires that if a submission is signed electronically, the person identified as the signer must personally enter the elements of the electronic signature.  By Plaintiff's own admission, such was not the case with respect to the two filings at issue.

* * *

All told, (i) Plaintiff's near admission of culpability, (ii) the inconsistencies between the documents produced by Plaintiff and its responses to Hybrid's Requests for Admission and (iii) Plaintiff's submission to the USPTO of declarations signed by unknowledgeable third parties are evidence from which an intent to deceive can be inferred.  At a minimum, there are questions of fact regarding Plaintiff's intent to deceive which preclude the granting of summary judgment Moreover, whether or not the requisite intent to defraud the USPTO exists, Plaintiff's HYBRID & COMPANY mark should be deemed void based on Plaintiff's egregious actions.  *See, e.g., T.A.D. Avanti, Inc. v. Phone-Mate, Inc.*, *supra*, 199 U.S.P.Q. at 653.

## III.    CONCLUSION

For the reasons set forth herein, as well as in Hybrid's papers in support of its Motion for Summary Judgment, (i) Plaintiff's Motion for Summary Judgment should be denied in its entirety and (ii) Plaintiff should be sanctioned pursuant to the Court's inherent power to sanction.

Dated: New York, New York
            October 26, 2015

**TARTER KRINSKY & DROGIN LLP**

By:    /s/ Mark J. Rosenberg
        Mark J. Rosenberg
        Debra Bodian Bernstein
        Christopher M. Tumulty
        1350 Broadway
        New York, New York 10018
        (212) 216-8000
        mrosenberg@tarterkrinsky.com
        dbernstein@tarterkrinsky.com
        ctumulty@tarterkrinsky.com